## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JOE WITHERSPOON, an individual,<br><br>                              Plaintiff,<br><br>v.<br><br>MONEYHUN EQUIPMENT SALES AND SERVICE CO., INC., a Wyoming corporation; DAVID H. MONEYHUN, an individual,<br><br>                    Defendants. | MEMORANDUM DECISION AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT<br><br>Case No. 1:10-cv-199-BCW<br><br>Magistrate Judge Brooke C. Wells |

Before the Court are Defendants Moneyhun Equipment Sales and Service Co., Inc. ("MESSCO") and David H. Moneyhun's [hereinafter collectively referred to as "Defendants"], Motion for Partial Summary Judgment[1] and Plaintiff Joe Witherspoon's ("Witherspoon") Motion for Partial Summary Judgment.[2]  Oral argument on both Motions was held on September 26, 2012, at which time attorney John V. Mayer appeared on behalf of Witherspoon and attorneys Paul Hickey and Jed Hansen appeared on behalf of Defendants.[3]  Before the hearing, the Court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement[4], the Court has further considered the law and facts relating to these motions.  For the reasons stated below, the Court grants Defendants' Motion for Partial Summary Judgment *in part* and denies Plaintiff's Motion for Partial Summary Judgment.

---

[1] Docket no. 94.
[2] Docket no. 96.
[3] Docket nos. 111-112.
[4] Docket no. 111.

# BACKGROUND[5]

The facts of this case arise from Plaintiff, Joe Witherspoon's employment with Defendant MESSCO.  Witherspoon was employed as a Senior Process/Design Engineer at MESSCO's facility in Rock Springs, Wyoming from approximately September 2009 to October 2010.  The subject of this lawsuit and the motions for partial summary judgment are the ownership rights to two inventions: clean coal technology[6] and an ultra-low emission gas dehydration unit ("ULE"). These inventions/technologies were developed and/or worked on by Witherspoon during the period Witherspoon was employed by MESSCO.

In November 2007, prior to his employment as a Senior Process/Design Engineer with MESSCO, Witherspoon was introduced to a clean coal technology that had been invented by Mr. Harold Bennett.  In the beginning of 2008, Witherspoon entered into a business agreement with a group of partners in a venture known as the Columbia Fuel Company ("Columbia Fuel").  The goal of Columbia Fuel was to explore development and implementation of Mr. Bennett's invention.  Mr. Witherspoon remained involved in the venture, which went through various name and membership changes, from 2008 to approximately the spring of 2009.   In approximately March of 2009, Witherspoon and another member of Columbia Fuel, John Klee, met with a patent attorney regarding Mr. Witherspoon's work on the clean coal technology but an application for patent protection was not initiated at that time.   According to Mr. Witherspoon, by May of 2009, he had invented the clean coal technology that is in dispute in this case.[7]

---

[5] All facts included in this section were taken from the briefs and exhibits filed in conjunction with the Plaintiff's and Defendants' Motions for Summary Judgment. See docket nos. 94, 95, 96, 97, 98, 100 and 107.

[6] Throughout the briefs, the terms "clean coal process," "coal reformation process," and/or "clean coal technology" are used to describe the invention at issue in this lawsuit.  However, for sake of clarity, and for purposes of this Memorandum Decision, this disputed invention will be referred to as "clean coal technology."

[7] However, it is undisputed that in conversations with Ms. Moneyhun during Witherspoon's employment with MESSCO, that Witherspoon was trying to come up with a new way to modify Mr. Bennett's prior clean coal process to make it patentable—thus the invention was undoubtedly based upon Mr. Bennett's work.

Witherspoon continued to work on the clean coal technology; and in June or July 2009, Mr. Witherspoon and another member of the Columbia Fuel, Mr. Michael Pavicic, broke ties with Mr. Klee and Columbia Fuel.   In early August, 2009, Witherspoon and Mr. Pavicic met with David Moneyhun ("Moneyhun"), President of MESSCO, in Salt Lake City, Utah in order to pitch Witherspoon's clean coal technology to Moneyhun with the hope that MESSCO and/or Moneyhun would invest in the technology.

MESSCO, which is headquartered in Rock Springs, Wyoming, has been in operation since 1998.  MESSCO is in the business of customizing solutions for oil and gas producers in order to control emissions that meet or exceed ambient air standards.   According to an article published in September 2009 (prior to Mr. Witherspoon's employment) in the Wyoming Business Report, MESSCO was developing a dehydration unit that would result in lower emissions of hazardous air pollutants as compared to the current products used in the oil and gas industry at the time.   As stated in the article, "MESSCO…is on the cutting edge of technological solutions to getting water out of natural gas pipelines while flaring off the vast majority of air pollution that's been giving state and federal regulators a major headache in Wyoming's gas fields."  According to Abby Moneyhun, co-founder of MESSCO and the current Chief Financial Officer who was interviewed for the article, "[MESSCO] has been solving dehydration and air emission problems for clients throughout the state."  Defendant Moneyhun, in his capacity as President and co-founder of MESSCO is responsible for MESSCO's overall business operations including business growth and delegation of responsibilities.

During the initial meeting in Salt Lake City between Witherspoon, Moneyhun and Pavicic, the discussion turned away from potential investment in the clean coal technology toward

Witherspoon's qualifications as an engineer.[8]   Thereafter, two additional meetings or "job interviews[9]" and a telephone conversation between Moneyhun and Witherspoon took place.   At one of the meetings, at another restaurant in Salt Lake City, a representative from The Williams Company ("Williams"), Danny Stahl was also present. Williams is a client of MESSCO and according to deposition testimony of Danny Stahl, prior to Witherspoon's employment with MESSCO, Williams and MESSCO had been discussing a "cleaner," more efficient dehydration unit for use in natural gas fields.   Witherspoon admitted that he understood Mr. Stahl to be the person addressing dehydration units attendant to Williams's production of natural gas.

At the final pre-employment meeting with Mr. Moneyhun in Salt Lake City, salary and expectations of Witherspoon's job as a design engineer for MESSCO were discussed.   During his deposition, Witherspoon admitted he was expected to meet customers' needs with field dehydration and troubleshoot or fix the existing dehydration systems.   Mr. Witherspoon further admitted he understood his job to include working on other various MESSCO products under the direction of Moneyhun.

On or about September 2, 2009, Witherspoon received a letter from MESSCO, offering him a position as a Senior Process/Design Engineer for MESSCO.   The employment offer letter set forth the following terms:

> $130,000/year Salary
> Group Medical Insurance (family coverage) available and paid 100% by Employer
> Group Dental Insurance available (family coverable) available and paid 100 % by Employer
> Group Life Insurance available (Employee paid)
> Supplemental Indemnity Insurance (AFLAC) available (Employee paid)
> Simple IRA with employer matching employee contribution, up to 3% of annual earnings

---

[8] After the presentation to Mr. Moneyhun, a subsequent presentation regarding the clean coal technology was presented to Abby Moneyhun in Rock Springs Wyoming on or about August 10, 2009.
[9] See Exhibit Q, Docket no. 107 at 25-26.

Two (2) weeks paid vacation available during the first year, with additional flexibility with regards to allowable personal time (contingent on completion of assigned work) [10]

No other terms were included in the offer letter.  Specifically, no mention was made as to the ownership of any intellectual property created by or worked on by Witherspoon during the term of his employment.  Witherspoon signed this letter and returned it to MESSCO and began work at MESSCO's Rock Springs facility on or about September 16, 2009.

A.    DEVELOPMENT OF THE ULTRA-LOW EMISSION GAS DEHYDRATION UNIT ("ULE")

The parties dispute how the development of the ULE was initiated.  MESSCO contends they were in the business of improving natural gas dehydration units and Witherspoon was aware of this when he began work for MESSCO.  Therefore, the development of the ULE was within the scope of Witherspoon's employment as a Design Engineer.   Witherspoon, on the other hand, argues that he came up with the idea for the ULE on his own initiative because he became aware of impending regulation changes and saw the usefulness of a low-emission dehydration unit.

Witherspoon admitted in deposition testimony that the ULE is an improvement in the process and outcome of previously engineered devices that MESSCO manufactures and Moneyhun authorized the work performed on the ULE.  Witherspoon also does not dispute that work on the ULE became part of his duties while employed at MESSCO.  Further, it is undisputed that all of the work performed by Witherspoon on the ULE took place during his salaried employment with MESSCO.  MESSCO provided and paid for the materials and equipment used in the development of the ULE.  Specifically, in developing the ULE, Witherspoon utilized software programs purchased by MESSCO, including Aspen HYSYS, and CODE WARE.  MESSCO also paid for drafting support for Witherspoon's work on the ULE and

---

[10] In addition to these benefits, Mr. Witherspoon was also provided housing in Rock Springs, Wyoming, and a laptop computer that he could use both at the MESSCO facility and elsewhere.  Witherspoon's personal cellular telephone bill was also paid by MESSCO during his employment with the company.

other MESSCO employees were allowed by the company to contribute to the development of the ULE prototype.   Witherspoon admits that the development of the ULE became a team project at MESSCO.  However, Witherspoon contends in his Opposition Memorandum and in his Third Supplemental Responses to MESSCO's discovery requests that Moneyhun and/or MESSCO promised him additional compensation for the development of the ULE.  MESSCO disputes this fact and no additional compensation was ever paid to Witherspoon.

On April 8, 2010, a Provisional Patent Application, paid for by MESSCO and prepared by MESSCO's attorney, Garron Hobson, was filed with the United States Patent and Trademark Office ("USPTO").  This patent application is identified as number 61/322,022 and lists Witherspoon as the sole inventor.  Witherspoon and a draftsman paid by MESSCO, prepared the documentation and drawings that accompanied this patent application.   According to a declaration filed by MESSCO's patent attorney, Garron Hobson, he conversed via telephone and email with Witherspoon in the preparation of the Provisional Patent Application.

After this Provisional Patent Application was filed, Attorney Hobson, on behalf of MESSCO requested that Witherspoon execute an assignment of rights to the ULE.  Initially, Witherspoon did not object to this request but eventually refused to execute the assignment. Witherspoon's employment with MESSCO was terminated on October 14, 2010.  Witherspoon claims his employment was terminated because he failed to assign or otherwise surrender his rights in the ULE and/or in the clean coal technology.

Since his termination with MESSCO, Witherspoon has not taken any further steps to produce or build the ULE.  However, both Witherspoon and MESSCO have filed Non-Provisional Patent Applications in conjunction with the ULE after the initiation of this lawsuit. The first Non-Provisional Patent Application was filed April 7, 2011 by MESSCO with

Witherspoon and Moneyhun listed as co-inventors of the ULE.  The second Non-Provisional Patent Application was filed the next day, April 8, 2011 by Witherspoon, naming himself as the sole inventor of the ULE.

### B.   FURTHER DEVELOPMENT OF CLEAN COAL TECHNOLOGY

It is undisputed that Witherspoon was not hired to specifically work on the clean coal technology and was directed that "anything he was doing with the coal project was going to be aside from MESSCO at that point in time."[11]  However, after his employment commenced with MESSCO, Witherspoon continued to work on the clean coal technology.  Despite leading MESSCO to believe he had cut all ties with his former clean coal associates, sometime between November of 2009 and February 2010, Mr. Witherspoon again became involved with his former associates.  But as of November, 2009, a member of the Columbia Fuel (which had been renamed NuCoal Solutions) testified in his deposition that he had not seen a complete written description of the process or full mechanical drawings of the technology.  In February 2010, Witherspoon hired and paid a draftsman to prepare drawings for the clean coal technology.

Witherspoon contends that all further work he performed on the clean coal technology while employed by MESSCO was undertaken outside of normal business hours, except for an occasional email or telephone call with others that are were interested in the technology.  Also, although no evidence has been presented that Mr. Witherspoon used the software Aspen HYSYS and CODE WARE that MESSCO had purchased for the development of the natural gas dehydration units (including the ULE that is in dispute here), the software was capable of being used on the further development of the clean coal technology.  There is evidence however, that Witherspoon used other software purchased by MESSCO on the clean coal technology.  Through the sworn statement of Moneyhun, "it appears to [Moneyhun] that Witherspoon completed work

---

[11] See Undisputed Fact #5, Pl.'s Mem. in Supp. of M. for Sum. J., docket no. 97.

on the clean coal [technology] using MESSCO software in at least October of 2009 and in May of 2010." Mr. Moneyhun's statement is based upon an email that was sent from Witherspoon to his former colleagues with design specifications using software named COMPRESS owned by MESSCO. This software, according to Moneyhun, was used by Witherspoon without MESSCO's authorization.

However, other than Moneyhun's statement relating to the COMPRESS software, no one at MESSCO saw Witherspoon work on the clean coal technology during normal business hours.[12] Numerous employees of MESSCO testified they assumed he was working on the technology but no employee testified they actually witnessed Witherspoon using MESSCO's software or working on the clean coal technology at MESSCO's facility.

By the spring of 2010, Witherspoon's development of the clean coal technology was complete. In March of 2010, while still working for and receiving a full salary from MESSCO, Witherspoon became a full member of NuCoal Solutions holding 866,667 shares of the company in exchange for rights in the alleged improvement of the clean coal technology. In addition, Witherspoon traveled to Arizona for a meeting where the latest developments in the clean coal technology were discussed by Witherspoon and a deadline for preparing materials for a Provisional Patent Application was set for April 9, 2010. MESSCO did not pay for any of Witherspoon's travel costs to Arizona and Witherspoon told MESSCO that he had to miss work because he was having surgery.

On April 15, 2010, a Provisional Patent Application was filed with the USPTO by Witherspoon entitled "Coal Reformation Process." This application was assigned serial no.

---

[12] MESSCO states in its Opposition Memorandum to Witherspoon's Motion for Summary Judgment that although MESSCO employees did not observe Witherspoon working on the clean coal technology during the work day or utilizing MESSCO's resources or materials, including software, "Defendants did not observe Mr. Witherspoon at all times during the work day to monitor whether he was indeed working on the clean coal process during regular business hours."

61/324,151.   MESSCO did not pay for the prosecution of this patent.   After the Provisional

Patent Application was filed, Witherspoon continued to work on the technology and made another

trip to Arizona.   MESSCO did not pay for this trip to Arizona either.

Witherspoon argues statements made by Ms. Moneyhun during Witherspoon's exit

interview relinquished any claim MESSCO might have in the clean coal technology.   Specifically,

another MESSCO employee, Pat Samples who was present during the interview, testified that Ms.

Moneyhun stated "they [MESSCO] didn't want anything to do with the clean coal [technology].

That it was his, and they didn't want anything to do with that and they hadn't been involved in it,

and that's why they never did anything further on it."[13]   MESSCO on the other hand, argues that

that Ms. Moneyhun's statements "stressed that to the extent that Mr. Witherspoon was interested

in stripping Mr. Bennett of his patent rights, MESSCO was not interested in the clean coal

[technology].   Otherwise MESSCO's interest in the clean coal [technology] was intact."[14]

In addition, MESSCO argues it did not totally abandon its potential interest and

investigation into the clean coal technology during Witherspoon's term of employment.   For

example, there were discussions relating to the technology between Witherspoon and both Mr.

and Ms. Moneyhun during Witherspoon's employment and officers of MESSCO made numerous

contacts with state and federal representatives and government agencies regarding the potential

use of the clean coal technology.   Officers of MESSCO also traveled to New Mexico to meet with

Mr. Harold Bennett to better understand the clean coal technology.   MESSCO also met with its

patent attorney regarding potential liabilities and patentability of the clean coal technology.

Witherspoon and Mr. Pavicic were present during least one of those meetings with MESSCO's

patent counsel on January 4, 2010.

---

[13] Exh. G, docket no. 97.
[14] Docket no. 98 at p. 22.

Lastly, MESSCO argues that during his term of employment, Witherspoon frequently missed deadlines and MESSCO was forced to hire additional employees in order to make up for the work for which Witherspoon was negligent.  This, according to Defendants evidences that while still being paid a full salary Witherspoon was neglecting his duties at MESSCO in order to work on the clean coal technology.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if the party can demonstrate through pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, that there is no genuine issue as to any material fact.[15]  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.[16]

Moreover, the opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts."[17]  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."[18]  Thus, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"[19]

---

[15] Fed. R. Civ. P. 56(c).
[16] Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Scott v. Harris, 550 U.S. 372, 380 (2007)(internal citations and quotations omitted)("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.").
[17] Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
[18] Anderson, 477 U.S. at 252.
[19] Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).

## ANALYSIS

Witherspoon's  Second Amended Complaint[20] alleges four causes of action:  (1) Breach of Implied-In-Fact Contract-MESSCO; (2) Punitive Damages-MESSCO; (3) Declaratory Relief-Provisional Patent Application No. 61/322,022 [ULE]-All Defendants; (4) Declaratory Relief-Provisional Patent Application No. 61/324,151 [clean coal technology]-MESSCO.

Defendants have asserted the following counterclaims against Witherspoon:  (1) Declaratory Relief-ULE; (2) Declaratory Relief-ULE and Clean Coal Technology; and (3) Unjust Enrichment.[21]

Earlier in this litigation, by applying Wyoming law, the Court dismissed additional tort claims that Witherspoon brought against MESSCO.[22]  In accordance with the Court's July 8, 2011 Order and for consistency, the Court will apply Wyoming law where applicable to the remaining claims contained in the Second Amended Complaint and Counterclaims that are the subject of the cross motions for summary judgment.[23]

Also, in its Order of July 8, 2011, the Court held that Witherspoon was an at-will employee with MESSCO.  Importantly too, in his Opposition Memorandum to Defendants' Motion for Partial Summary Judgment, Witherspoon does not dispute that he has provided no evidence that MESSCO had any policies or procedures that created an implied-in-fact contract or that MESSCO violated any federal or state law by terminating his employment.[24]

---

[20] Docket no. 85.
[21] Docket no. 92.  For clarity, all quotations or citations to the Claims for Relief and Counterclaims were copied in this Order exactly how they appear in Second Amended Complaint (Docket no. 85) and Defendants Answer to Second Amended Complaint and Counterclaim (Docket no. 92).
[22] Docket no. 30.
[23] The Court notes that the Defendants cited Wyoming law in support of their Motion for Summary Judgment while Plaintiff made no such reference.
[24] See docket no. 100 at p.12-13.

A. **GENERAL RIGHTS OF EMPLOYEE AND EMPLOYER TO INTELLECTUAL PROPERTY & "SHOP RIGHTS"**[25]

Generally, "an invention presumptively belongs to its creator" and an "individual owns the patents rights" in his or her invention.[26]  But "[t]his simple proposition becomes more complex when one creates while employed by another person"[27] and "the law has recognized that employers may have an interest in the creative products of their employees."[28]  Therefore, courts have recognized that in certain situations, employers may be entitled to ownership in an employee's invention or may be entitled to license rights known as "shop rights."

In order to determine the rights of employees and employers, generally, courts first examine the employment contract.  However, if, the contract of employment does not contain a provision regarding inventions, as is the case here, an employer is not necessarily precluded from claiming a right to an employee's invention.

Courts, including the Wyoming Supreme Court, have recognized what is termed the "hired to invent doctrine."   This doctrine is described as follows:

> [i]f an employee's job duties include the responsibility for inventing *or for solving a particular problem that requires invention*, any invention created by that employee during the performance of those responsibilities belongs to the employer.  Hence, such an employee is bound to assign to the employer all rights to the invention.  This is so because, under these circumstances, the employee has produced only that which he was employed to produce, and the courts will find an implied contract obligation to assign any rights to the employer.[29]

---

[25] The Court notes that this case appears to present issues of first impression in this district as the Court has failed to find any cases that have applied wither the "hired to invent" or "shop rights doctrine."

[26] Teets v. Chromalloy Gas Turbine Company, 83 F.3d 403, 407 (Fed. Cir. 1996).

[27] Id.

[28] Id. (internal citations omitted).

[29] Scott System, Inc. v. Scott, 996 P.2d 775 (Colo. App. 2000)(citing United States v. Dubilier Condenser Corp., 289 U.S. 178 (1933); Solomons v. United States, 137 U.S. 342 (1890); Hewett v. Samsonite Corp., 507 P.2d 1119 (1973)(emphasis added). See also Preston v. Marathon Oil Co., 2012 WY 84, ¶ 2, 277 P.3d 81, 84 (Wyo. 2012) ("[i]f an employee's job duties include the responsibility for inventing or for solving a particular problem that requires invention, any invention created by that employee during the performance of these responsibilities belongs to the employer…")(internal citations omitted)(emphasis added).

Alternatively, "when an employee who was not hired to invent does invent something as part of his work duties, the employer is given a "shop right" to use the invention."[30]  A "shop right is an employer's royalty or fee, a nonexclusive and nontransferable license to use an employee's patented invention."[31]  In determining whether a shop right exists, the parties' relationship is examined and an

> employer will have shop rights in an invention in situations where the employer has financed an employee's invention by providing wages, materials, tools and a work place. Other factors in creating shop rights include an employee's consent, acquiescence, inducement, or assistance to the employer in using the invention without demanding compensation or other notice of restriction.[32]

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT-CLEAN COAL TECHNOLOGY

Witherspoon moves for partial summary judgment related to the parties' rights in the clean coal technology.  Specifically, Witherspoon moves for summary judgment as to the following causes of action:  (a) Count Four Second Amended Complaint, Declaratory Relief as to Patent Application 61-324,151 [clean coal patent] and (b) Counterclaim Two, Declaratory Relief as to Clean Coal Technology under the "shop rights doctrine."

Here, Witherspoon argues that he did not conceive or further develop the clean coal technology as part of his employment with MESSCO.  Further, Witherspoon argues that he did not work on the clean coal technology on MESSCO time or using MESSCO's resources, except for an occasional email or telephone call during his work day at MESSCO.  Witherspoon does admit he used a laptop issued by MESSCO for the clean coal technology but that the laptop's use was largely for emails.   Witherspoon argues he conceived of the idea for the clean coal technology prior to his employment with MESSCO as evidenced by the purpose for the initial

---

[30] Preston, at 84.
[31] Id.
[32] McElmurry v. Arkansas Power & Light Company, 995 F.2d 1576, 1582 (Fed. Cir. 1993)(internal citations omitted).

meeting with Moneyhun, which was to secure investors in his technology--not to secure employment with MESSCO.

MESSCO, on the other hand, asserts it is entitled to a "shop right" in the coal reformation process based on allegations that Witherspoon "did specific work on the further development and refinement of clean coal technology" while a salaried employee of MESSCO.[33]  MESSCO believes Witherspoon used MESSCO materials in the further development of the clean coal technology.  While the record is not plush with evidence of what exact materials other than an company-issued laptop were used by Witherspoon, Moneyhun by way of sworn affidavit contends that based upon an email sent from Witherspoon to his former colleagues with design specifications,  MESSCO-owned software, named COMPRESS was used by Witherspoon without MESSCO's authorization.  "It appears to [Moneyhun] that Witherspoon completed work on the clean coal [technology] using MESSCO software in at least October of 2009 and in May of 2010."[34]  There is also evidence by way of Witherspoon's own admission that he used MESSCO's company-issued laptop and his personal cellular telephone that was paid for by MESSCO in order to communicate with others about the clean coal technology.

MESSCO contends also Witherspoon missed deadlines and didn't complete his work in a satisfactory manner because he was working on the clean coal technology while still being a salaried employee of MESSCO.  MESSCO further argues development efforts of the clean coal technology were conducted primarily while Witherspoon was employed by MESSCO.

This Court has also considered that Witherspoon never indicated to MESSCO or Mr. or Ms. Moneyhun that he was *not* interested in their investment in the clean coal technology after his employment with MESSCO commenced.   In fact, there were discussions relating to the

---

[33] Docket no. 31.
[34] Exh. 7, docket no. 97, ¶ 10.

technology between Witherspoon and both Mr. and Ms. Moneyhun during Witherspoon's employment. Witherspoon also did not advise the Moneyhuns that he was seeking outside funding or that he was traveling to Arizona to meet with others that were interested in the project, or that he became a shareholder in a company in exchange for development of the clean coal technology.

Accordingly, in the Court's view, during Witherspoon's employment with MESSCO, the company did not lose interest in the clean coal technology. For example, officers of MESSCO made numerous contacts with state and federal representatives and government agencies regarding the potential use of the clean coal process and also traveled to New Mexico to meet with Mr. Harold Bennett to better understand the clean coal technology. MESSCO met with its patent attorney regarding potential liabilities MESSCO might have related to the clean coal technology. Witherspoon and Mr. Pavicic were present for a meeting with MESSCO's patent counsel on January 4, 2010. Although ultimately Witherspoon sought patent protection on his own for the clean coal technology.

The meaning of statements made by Ms. Moneyhun during Witherspoon's dismissal interview is also in dispute. Witherspoon contends Ms. Moneyhun's statements relinquished any interest in the clean coal technology, while Defendants argue that Ms. Moneyhun's statements "stressed that to the extent that Mr. Witherspoon was interested in stripping Mr. Bennett of his patent rights, MESSCO was not interested in the clean coal [technology]."[35] Therefore, MESSCO's interest in the clean coal [technology] was intact and Ms. Moneyhun's statements are consistent with MESSCO seeking a "shop right" in the clean coal technology.

In sum, the Court is convinced that genuine issues of material fact exist with respect to whether MESSCO is entitled to a shop right in the clean coal technology. Based upon the

---

[35] Docket no. 98 at p. 34.

evidence presented and drawing all reasonable inferences in a light most favorable to the Defendants, the non-moving party, the Court concludes that a reasonable jury could rule in favor of Defendants.  Thus, summary judgment is inappropriate and Plaintiff's Motion for Summary Judgment as to the clean coal technology is denied.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT-ULE

Defendants move for partial summary judgment declaring MESSCO as the sole owner of the ULE, or in the alternative, to declare that MESSCO is entitled to a "shop right" in the ULE. Defendants also move for dismissal with prejudice of Witherspoon's claims for breach of implied-in-fact contract and punitive damages.   Thus, Defendants move for partial summary judgment on the following counts:  (a) Count One of Second Amended Complaint, Breach of Implied-In-Fact Contract as to MESSCO; (b) Count Two of the Second Amended Complaint-Punitive Damages as to MESSCO; (c) Count Three, Declaratory Relief-Patent Application No. 61/322,022 [ULE Patent] as to All Defendants; (d) Counterclaim One-Declaratory Relief-ULE; and (e) Counterclaim Two-Declaratory Relief-ULE and Clean Coal Technology under the "Shop Right" Doctrine.[36]

### 1.     **Ownership & Shop Rights of the ULE**

Defendants' Motion for Summary Judgment as to the ULE technology is Granted.   First, there can be no doubt that MESSCO has a "shop right" in the ULE.  At oral argument, Witherspoon conceded this point and there has been no dispute in the written materials as to that issue.  However, in addition to the shop right, MESSCO is entitled to be declared as the sole owner of the ULE.  This Court reaches this conclusion based on the following:

---

[36] Docket no. 96.  In their Motion for Partial Summary Judgment asks the court to dismiss "Counts Two, Four, and Five of the Plaintiff's Second Amended Complaint."  However, the Second Amended Complaint does not contain a "Count Five."  Thus, by reading further into the briefs, and through oral argument, it appears that this was a typo and therefore the correct counts Defendants seek to dismiss are set forth above.

First, the employment letter that was sent to Witherspoon offering him employment only states that Witherspoon was to be hired for the position of "Senior Process/Design Engineer."[37] It does not state with specificity exactly what Witherspoon's responsibilities were to be while employed by MESSCO or state any terms describing the ownership arrangements for any intellectual property created by Witherspoon.  Thus, because an express contract is not present here, MESSCO requests that the Court apply the "hired-to-invent" doctrine in order to find that an implied-in-fact contract existed between Witherspoon and MESSCO.  Such a contract, MESSCO argues would establish that MESSCO has full ownership rights in the ULE.

When applying the "hired to invent" doctrine, courts "must examine the employment relationship at the time of the inventive work to determine if the parties entered into an implied-in-fact contract to assign patent rights."[38]  In making this determination, state contract law principles provide the rules for identifying and enforcing implied-in-fact contracts.[39]  In Wyoming, "[i]n determining whether an implied contract was formed, [we] look not to the subjective intent of the parties, but to 'the outward manifestations of a party's assent sufficient to create reasonable reliance by the other party.'"[40]  Thus, "an implied-in-fact contract to assign inventive rights is a question of fact."[41]

The Court finds the following cases to be analogous and uses them as guidance in applying the hired-to-invent doctrine to the present case.

---

[37] The general nature of the "Design Engineer" position can be better understood by looking at the definitions of the two words independently.  "Design" is defined as "to form or conceive in the mind; contrive; plan" or "to plan and fashion the form and structure of an object, work of art, decorative or scheme, etc." or "the combination of details or features of something executed or constructed."  "Engineer" is defined as "a person trained and skilled in the design, construction, and use of engines or machines."  WEBSTER'S COLLEGE DICTIONARY 360, 437 (Deluxe ed. 2000).  Thus, it seems to the Court it would be fair to say that Witherspoon was hired to "conceive or design" for MESSCO.

[38] Teets, at 407.

[39] Banks v. Unisys Corp., 288 F.3d 1357, 1359 (Fed. Cir. 2000)(internal citations omitted).

[40] Birt v. Wells Fargo Home Mortgage, Inc., 75 P.3d 640, 649 (Wyo. 2003)(quoting Givens v. Fowler, 984 P.2d 1092, 1095 (Wyo.1999).

[41] Teets, at 408.

In <u>Teets v. Chromalloy Gas Turbine Corp.</u>, the Court of Appeals for the Federal Circuit found an implied-in-fact contract of assignment where the plaintiff undertook a project to develop a one-piece leading edge for airplane turbine blades.[42]  The court reasoned that the plaintiff spent 70% of his time on the project, invented a solution, and reduced the invention to practice using his employer's resources.[43] Further, the court noted that the employer paid for the prosecution of the patent application and that the plaintiff acknowledged his employer's role in the development of the invention.[44]

Like the plaintiff in <u>Teets</u>, Witherspoon invented a solution to a problem that Defendants were trying to solve prior to his employment.   Namely, MESSCO was working to improve the existing dehydration units that were in service in the oil and gas industry in order to produce a "cleaner" dehydration unit to meet existing and future environmental quality standards.  Such is evidenced by an article in the Wyoming Business report published prior to Witherspoon's employment which stated "MESSCO…is on the cutting edge of technological solutions to getting water out of natural gas pipelines while flaring off the vast majority of air pollution that's been giving state and federal regulators a major headache in Wyoming's gas fields."  In addition, Danny Stahl, an employee of Williams (one of MESSCO's clients) had conversations with Moneyhun regarding emissions standards in the hopes an improved dehydration unit could be developed.  Mr. Stahl also accompanied Moneyhun to one of the "job interviews" with Witherspoon and the trio discussed dehydration units as well as Witherspoon's qualifications as an engineer.

Witherspoon asserts that he was not hired to develop the ULE specifically and conceived the idea on his own initiative.  Therefore summary judgment is not appropriate because there are

---

[42] <u>Id</u>. at 408.
[43] <u>Id</u>.
[44] <u>Id</u>.

issues of material fact as to the purpose of his employment with regard to the ULE and the purpose of his employment is vital to the hired-to-invent analysis.  To further bolster his arguments that summary judgment is inappropriate, Witherspoon asserts that Moneyhun promised him extra compensation for his development of the ULE which evidences MESSCO and/or Moneyhun's acknowledgement that the development of the ULE was beyond his normal salaried duties with MESSCO.

Although the purpose of Witherspoon's employment as it relates to invention was not "expressly" relayed to him at the outset of his employment nor relayed to him directly during his employment, Witherspoon has admitted that the ULE is an improvement in the process and outcome of previously engineered devices that MESSCO manufactures and that he was hired to meet customers' needs with field dehydration, troubleshoot and work on MESSCO's existing dehydration units.  He also admits that the work on the ULE became part of his duties at MESSCO.  As recognized by the Court in Teets,

> …when an employer hires a person for general service and the employee invents on the side, the invention belongs to the employee.  However, the employer may claim ownership of the invention if the employer hires a person for the 'specific purpose for making the invention.'"  *Even if hired for a general purpose, an employee with the specific task of developing a device or process may cede ownership of the invention from that task to the employer.*[45]

Here, it is undisputed that Witherspoon did not do any "inventing on the side" with respect to the ULE.  All of the work performed on the ULE was performed with the full acquiescence and support of MESSCO.  Through his deposition testimony, Witherspoon admitted that the work performed on the ULE was authorized by Moneyhun and became part of his duties.  No evidence has been presented that Witherspoon acted on his idea prior to getting approval by Moneyhun. Further, Witherspoon and other employees of MESSCO spent significant time on this project,

---

[45] Teets, at 407-408 (emphasis added).

including the development of a prototype.   Thus, although Witherspoon may have been hired as a general purpose Design Engineer, he was given a specific task of meeting customers' expectations and working on existing MESSCO dehydration units.  In looking at the time of the inventive work, the development of the ULE was within the tasks assigned to Witherspoon.  The ULE not only met an unmet need of MESSCO's customers, specifically Williams, but improved upon technology that MESSCO had already developed.  MESSCO provided all the materials necessary to Witherspoon to develop the ULE, including purchase of software programs, hiring of a third party draftsman and the use of other MESSCO employees.  MESSCO also paid for prosecution of the patent for the ULE invention.   Therefore, the Court finds that the facts in this case analogous to those evaluated in the Teets decision.

Next, Witherspoon argues that his refusal to sign an assignment of rights to the ULE evidences that an implied-in-fact contract does not exist.  To support his position, Plaintiff cites to Banks v. Unisys Corp.[46] In Banks, the Court held that summary judgment was not appropriate under the hired to invent doctrine where an employee-inventor refused to sign an agreement to assign his inventive rights to the company at the commencement of his employment and was listed without his knowledge as a co-inventor on patent applications filed by the employer.

Unlike Banks, Witherspoon was not approached about assigning his rights to any intellectual property at the beginning of his employment.  Nor was Witherspoon unaware of the patent applications that were filed listing him as a co-inventor.  Rather, Witherspoon met and corresponded with MESSCO's patent counsel and also prepared documents that accompanied the Provisional Patent Application.  Further, the Court agrees with the argument made by counsel for both parties during oral argument that Witherspoon being listed as the sole inventor on the Provisional Patent Application filed by MESSCO does not raise genuine issues of material fact

---

[46] 228 F.3d 1357 (Fed. Cir. 2007).

because the inventor listed on a Provisional Patent Application is customarily merely a placeholder.  Lastly, unlike Banks, there have been no allegations made by Witherspoon that he was fraudulently induced to assign his rights to MESSCO or that Witherspoon refused to sign any other agreements related to intellectual property.

Lastly, as to Witherspoon's arguments that he was promised additional compensation and the idea for the ULE was brought about by his own initiative, the Court finds that these arguments do not raise issues of genuine material fact in light of the evidence in this case.  There is no evidence other than Mr. Witherspoon's own statements that he was promised additional compensation by MESSCO.  Witherspoon was never paid additional compensation nor was the promise ever reduced to writing.  In addition, even if Witherspoon's arguments related to additional compensation are viewed in the light most favorable to him, additional compensation does not disturb the Court's analysis as to the Teets or Banks decisions.  Neither of those courts discussed the issue nor would a promise of a "bonus" indicate that an implied-in-fact contract did not exist.   The evidence clearly indicates that although Witherspoon may have come up with the idea for the ULE on his own, the reduction to practice of the ULE and/or actual inventive work was performed within the scope of his duties as a Design Engineer for MESSCO.   Therefore, the Court finds Witherspoon's arguments as to the ULE do not raise genuine issues of material fact.  The Court finds a reasonable jury could not rule in Witherspoon's favor in relation to ownership of the ULE because of MESSCO's significant investment in the ULE and what Witherspoon admitted his position with MESSCO to entail.  Thus, summary judgment is granted in favor of the Defendants as to the ULE.

Accordingly, MESSCO is declared the sole owner of the ULE.  Witherspoon has no rights in the ULE and Witherspoon is therefore ORDERED to execute an assignment of rights to

MESSCO for this invention as evidence of MESSCO's ownership of the ULE.  Because MESSCO is declared the sole owner of the ULE, Defendants' claims as to the "shop right doctrine" in the ULE are moot.   Lastly, as to the ULE, Witherspoon's claims that MESSCO breached and implied-in-fact contract fail and are dismissed.

2.  **Breach of Implied-in-Fact Contract and Shop Rights in Clean Coal Technology**

For the reasons set forth more fully above, the Court finds there are genuine issues of material fact relating to the clean coal technology and has denied Plaintiff's Motion for Summary Judgment with respect to that technology.  Accordingly, the Court also denies Defendants' Motion for summary judgment as to the claims associated with the clean coal technology. Namely, summary judgment is denied as to Count Two of the Amended Complaint as to the clean coal technology and Counterclaim Two-Declaratory Judgment under the "Shop Rights" Doctrine as to the clean coal technology.

3.  **Punitive Damages**

As to Plaintiff's Count Two alleging Punitive Damages against MESSCO, Defendant's Motion for Summary Judgment is granted.   As a preliminary matter, Plaintiff has failed to discuss either at oral argument or through its Opposition Memorandum to Defendant's Motion for Summary Judgment Plaintiff's claim for Punitive Damages.  However, even despite Plaintiff's failure to oppose summary judgment with regard to punitive damages, the Court finds that summary judgment is appropriate on this claim.

First, "in Wyoming, punitive damages are an element of a claim or cause of action and are not a separate claim."[47] In addition, Wyoming Courts have recognized that "punitive damages are generally not recoverable in an action upon a contract…[and] are not proper in an action upon a

---

[47] <u>Errington v. Zolessi</u>, 9 P.3d 966, 969 (Wyo, 2000).

contract to recover damages resulting from a breach of contract."[48] Moreover, "in order to recover punitive damages in an action upon a contract, 'there must be evidence of spite, ill will or willful and wanton misconduct at the inception of the fraudulent contact.'"[49]

Here, the only remaining claims other than for punitive damages are for breach of implied contract and for declaratory relief.  As recognized above, in Wyoming punitive damages are generally unavailable for breach of contract claims.  In addition, although the Court is denying summary judgment as to Count Two of the Amended Complaint as it relates to a Breach of Implied-in-Fact Contract and the Clean Coal Technology, the Court is satisfied that there are no issues of material fact with regard to evidence of spite, ill will or willful and wanton misconduct on MESSCO's behalf related to Witherspoon's termination of employment.  In addition, at least one Court in Wyoming has recognized that a claim for punitive damages may be available when one party breaches a contract in bad faith, attendant to a claim of breach of the implied covenant of good faith and fair dealing.[50]  However, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing was dismissed by the July 8th Order of the Court.   Therefore, based on the remaining claims in this case, Witherspoon has no basis for recovery of punitive damages and summary judgment is proper as to this claim.

---

[48] Arnold v. Mountain West Farm Bureau Mut. Ins. Co., Inc., 707 P.2d 16, 164 (Wyo. 1985)(citing United States v. Redland, Wyo., 695 P.2d 1031 (1985)); see also TruGreen Cos., LLC v. Mower Bros., Inc., 199 P.3d 929, 933 (Utah 2008)(quoting Hal Taylor Assocs. v. Unionamerica, Inc., 657 P.2d 743, 750 (Utah 1982)("We have held that punitive damages for breach of contract, by themselves, are inappropriate "even if intentional and unjustified.")
[49] Id.
[50] See Arnold at 164.

## **CONCLUSION & ORDER**

For the foregoing reasons:

1.   Defendants' Motion for Partial Summary Judgment[51] is **GRANTED** *in part*.

2.   Plaintiff's Motion for Partial Summary Judgment[52] is **DENIED**.

In accordance with this Order:

a.   Witherspoon is **ORDERED** to execute an assignment of rights to the ULE in order to
     evidence MESSCO's sole ownership of the ULE.  This assignment is to be executed
     within thirty (30) days from the issuance of this Order.

b.   Defendant David Moneyhun is to be terminated from the case because the remaining
     claims contained within the Second Amended Complaint are directed against solely
     against Defendant MESSCO.

c.   The Parties are **FURTHER ORDERED** to meet and confer and submit to the Court
     within thirty (30) days from the issuance of this Order a Proposed Amended
     Scheduling Order[53] that will govern the remainder of the case going forward.

         DATED this 3rd day of May, 2013.

                                        *Brooke C. Wells*

                                        Brooke C. Wells
                                        United States Magistrate Judge

---

[51] Docket no. 94.
[52] Docket no. 96.
[53] Per Order of the Court, the Scheduling Order in this case was vacated and all deadlines were terminated.  See
docket no. 115.